UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EARL E. SCOTT,

                              Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                              Defendant.

Case No. 3:10-cv-05279-RBL-KLS

REPORT AND RECOMMENDATION

Noted for March 25, 2011

        Plaintiff has brought this matter for judicial review of defendant's denial of his

applications for disability insurance and supplemental security income ("SSI") benefits.  This

matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §

636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v.

Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the

undersigned submits the following Report and Recommendation for the Court's review,

recommending that for the reasons set forth below, defendant's decision be reversed and this

matter be remanded for further administrative proceedings.

                        FACTUAL AND PROCEDURAL HISTORY

        On August 2, 2006, plaintiff filed an application for disability insurance benefits and

another one for SSI benefits, alleging disability as of September 30, 2005, due to mental health

issues and hepatitis C.  See Tr. 11, 99, 104, 131.  Both his applications were denied upon initial

administrative review and on reconsideration.  See Tr. 11, 60, 65, 67.  A hearing was held before

REPORT AND RECOMMENDATION - 1

an administrative law judge ("ALJ") on January 28, 2009, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. See Tr. 11, 24-55.

On April 1, 2009, the ALJ issued a decision in which plaintiff was determined to be not disabled. See Tr. 11-23. Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on February 17, 2010, making the ALJ's decision defendant's final decision. See Tr. 1; see also 20 C.F.R. § 404.981, § 416.1481. Plaintiff filed a complaint in this Court on April 23, 2010, seeking judicial review of the ALJ's decision. See ECF #1. The administrative record was filed with the Court on July 16, 2010. See ECF #7. The parties have completed their briefing, and thus this matter is now ripe for the Court's review.

Plaintiff argues the ALJ's decision should be reversed and remanded to defendant for an award of benefits or, in the alternative, for further administrative proceedings, because the ALJ erred: (1) in failing to identify all of plaintiff's severe impairments; (2) in evaluating the medical in the record; (3) in assessing plaintiff's credibility; (4) in evaluating the lay witness evidence in the record; (5) in assessing plaintiff's residual functional capacity; and (6) in finding plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to defendant for further administrative proceedings.

## DISCUSSION

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

REPORT AND RECOMMENDATION - 2

support a conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. See Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. See Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.     The ALJ's Step Two Determination

        Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step thereof, the disability determination is made at that step, and the evaluation process ends. See id. At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." 20 C.F.R. § 404.1520, § 416.920. An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c), § 416.920(a)(4)(iii), (c); see also Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

        An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; see also Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). This step

two inquiry, however, is a *de minimis* screening device used to dispose of groundless claims. See Smolen, 80 F.3d at 1290.

In this case, the ALJ found plaintiff had "severe" impairments consisting of an affective disorder and hepatitis C. See Tr. 13.  Plaintiff argues the ALJ erred in not also determining that he had severe impairments consisting of a psychotic disorder, a generalized anxiety disorder and posttraumatic stress disorder ("PTSD").  The undersigned agrees the ALJ erred in his analysis of these latter three impairments at this step.  First, the record shows plaintiff was diagnosed with the first two of those three impairments by both Daniel M. Neims, Psy.D., and Brett Troubridge, Ph.D., two examining psychologists, with Dr. Troubridge also diagnosing plaintiff with PTSD, as did two of plaintiff's non-physician mental health treatment providers. See Tr. 195, 241, 350, 354, 372.  Drs. Neims and Troubridge found plaintiff had significant mental functional limitations stemming at least in part from the above impairments. See Tr. 196, 356, 373.  Further, the other two mental health providers assessed plaintiff with a global assessment of functioning ("GAF") score of 48 and 50 respectively, again due at least in part to a diagnosis of PTSD.[1] See Tr. 241, 350.  Yet a third examining physician, Neil K. Khanna, M.D., diagnosed plaintiff with psychosis, and gave him a GAF score of 50.[2] See Tr. 211.

Second, even though, as explained below, the ALJ properly discounted the severity of the mental functional limitations assessed by Dr. Neims and Dr. Troubridge, he did not actually find plaintiff had no mental functional limitations – and, indeed, did not appear to reject the diagnosis

---

[1] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007).  "[A] GAF score in the forties may be associated with a serious impairment in occupational functioning." Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007); see also Pisciotta, 500 F.3d at 1076 n.1 (GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as an inability to keep job).

[2] See England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in general ability to perform basic tasks of daily life); see also Pisciotta, 500 F.3d at 1076 n.1.

REPORT AND RECOMMENDATION - 4

of psychosis and GAF score assessment of Dr. Khanna – or that they were due only to plaintiff's diagnosed affective disorder. See Tr. 14, 16-21. Defendant argues any error the ALJ committed here was harmless, because the ALJ analyzed all of plaintiff's impairments in combination later in assessing his residual functional capacity. See Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion).

But it is not at all clear that the ALJ actually considered all of plaintiff's impairments in combination, particularly given that, as defendant admits, the ALJ made no mention of the PTSD diagnosis in his decision. Defendant also is incorrect in asserting there are no additional mental functional limitations stemming from the PTSD diagnosis, that are not already represented by the ALJ's consideration of the medical evidence in the record. That evidence shows, as noted above, that Dr. Troubridge found plaintiff had fairly significant mental limitations stemming at least in part from that diagnosis, even though, as discussed above, the ALJ did not err in discounting the severity of those impairments. Defendant, furthermore, concedes that the ALJ did not reject the GAF score of 50 assessed by Dr. Khanna. See ECF #13, p. 10. While defendant correctly notes that such a score is indicative of a "severe" impairment, he fails to point out it was based in part on the psychosis diagnosis Dr. Khanna made, which the ALJ seems not to have discussed much, if at all, later on in assessing plaintiff's residual functional capacity.

II.    The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639,

REPORT AND RECOMMENDATION - 5

642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." <u>Morgan v. Commissioner of the Social Sec. Admin.</u>, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." <u>Id.</u> at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see</u> <u>also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>See</u> <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need

REPORT AND RECOMMENDATION - 6

not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>see</u> <u>also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001).   An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.   A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A.   GAF Scores

Plaintiff argues the ALJ erred in failing to mention or explain why he rejected the GAF scores of 50 and 48 assessed by the above two non-physician mental health treatment providers in early August 2006, and late September 2006, respectively (<u>see</u> Tr. 241, 350), and in failing to state why he did not accept the GAF score of 50 assessed by Dr. Khanna.   Defendant argues the ALJ was not required to specifically consider the GAF scores of the two mental health providers, in light of his consideration and acceptance of the one assessed by Dr. Khanna.   But it is not at all clear that the ALJ actually, or fully, accepted Dr. Khanna's GAF score, since, as noted above, a GAF score of 50 indicates "serious" symptoms or impairment in social, occupational or school functioning, and the only mental functional limitations adopted by the ALJ were a restriction to simple and routine tasks and occasional contact with the public.   A GAF score of 50, however, very well may evidence more extensive or severe limitations than that.

The undersigned agrees with plaintiff, furthermore, that the fact that similar GAF scores were rendered by other medical sources in the record does not necessarily make them duplicative or insignificant.   This might be true where the same medical source has assessed more than one

REPORT AND RECOMMENDATION - 7

similar GAF score over a limited time period.  Here, however, the above GAF scores have been

assessed by three different medical sources over a four month time period, thereby tending to add

credence to those scores being representative of plaintiff's functioning, at least during that time.

As such, the undersigned finds those scores all constitute significant probative evidence the ALJ

should have considered.  He thus erred in failing to fully do so.

        B.       <u>Mr. Bushue's Treatment Notes</u>

Plaintiff argues the ALJ erred in failing to mention in his decision that:

- "[O]n November 6, 2006, [Dwight] Bushue[, A.R.N.P., one of the two mental health treatment providers discussed above,] wrote that [plaintiff] stated that his symptoms of thought disorder seem to be increasing, and he has been hearing more voices and has been more paranoid";

- "[O]n December 11, 2006, Mr. Bushue wrote that [plaintiff] was continuing to have occasional auditory hallucinations that are coming from inside his head";

- "[O]n March 19, 2007, Mr. Bushue reported that [plaintiff] was experiencing fairly vivid nightmares which were bothersome, and was also experiencing multiple side effects from his Interferon treatment"; and

- "[O]n May 31, 2007, Mr. Bushue reported that [plaintiff] began experiencing symptoms of a thought disorder after discontinuing his Geodon."

ECF #11, p. 14; <u>see</u> <u>also</u> Tr. 314, 317, 325, 329.  But "[t]he mere existence of an impairment [or

impairment-related symptoms] is insufficient proof of a disability," without any evidence that the

diagnosed impairment or noted impairment-related symptoms actually have resulted in specific

work-related limitations. <u>Matthews v. Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993).  Here, plaintiff

has not done so, since the above statements from Mr. Bushue merely relate what plaintiff himself

has reported, and Mr. Bushue has not specifically linked those reports to work-related limitations

stemming therefrom.  Thus, the ALJ was not required to expressly address the above statements

in his decision, particularly because as discussed in greater detail below, the ALJ overall did not

REPORT AND RECOMMENDATION - 8

1  err in discounting plaintiff's credibility concerning his subjective complaints.

2      C.      Dr. Neims and Dr. Troubridge

3      Plaintiff challenges as well the ALJ's rejection of the medical opinions provided by Dr.

4  Neims and Dr. Troubridge, with respect to which the ALJ found in relevant part:

> . . . In June 2007, Dr. Neims opined that the claimant is disabled due to mental
> health (Exhibit 19F).  While there is objective evidence that the claimant has a
> mental health condition and some resulting limitation, the undersigned finds
> that the evaluations conducted by Dr. Neims and Dr. Troubridge are largely
> based on the claimant's self-reported symptoms and complaints, and the
> undersigned does not find the claimant entirely credible.  The claimant was
> likely aware that the continuation of his state assistance was dependent upon
> the [state agency] evaluations, and the claimant had incentive to overstate his
> symptoms and complaints.  Furthermore, as [state agency] evaluators, Dr.
> Neims and Dr. Troubridge do not have a treating relationship with the
> claimant, and the undersigned therefore finds their opinions unreliable.

Tr. 18-19.  First, plaintiff argues the substantial evidence in the record fails to support the ALJ's

statement that Dr. Neims and Dr. Troubridge based their evaluations largely on his own self-

reported symptoms and complaints.  While it does seem those medical sources relied at least to

some extent on plaintiff's self-reporting (see Tr. 352-57, 371-74), that appears not to be the only

basis for their opinions.  For example, both psychologists conducted psychological testing and/or

a mental status examination, and also provided their own clinical observations of plaintiff, which

by themselves may form the basis of a psychological diagnosis and assessment.  See Tr. 354, 356,

358-60, 372-73; see also Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987 (finding opinion

based on clinical observations supporting psychiatric diagnosis is competent evidence); Sanchez

v. Apfel, 85 F. Supp.2d 986, 992 (C.D. Cal. 2000).

      In addition, the undersigned agrees that there is no evidence to suggest that to the extent

plaintiff was "likely aware that the continuation of his state assistance" depended on the findings

and opinions of Drs. Neims and Troubridge, this gave him the "incentive" – let alone caused him

REPORT AND RECOMMENDATION - 9

– to "overstate his symptoms and complaints" at the time. Tr. 19.  Here too then the ALJ did not

rely on a proper basis for rejecting the opinions of those medical sources.  Likewise, the fact that

neither Dr. Neims nor Dr. Troubridge had "a treating relationship" with plaintiff is by itself a

valid reason for rejecting their findings and opinions, given that, as noted above, the opinion of

an examining physician alone may constitute substantial evidence.

The undersigned disagrees, however, that the ALJ erred in rejecting the opinions of Drs.

Neims and Troubridge in part on the following basis:

> . . . there is evidence that the claimant has presented differently to different
> providers.  For example, in June 2007, Dr. Neims opined that the claimant has
> marked limitations in social functioning (Exhibit 19F); however, on April 19,
> 2007, Nurse Bushue noted that the claimant "presents very friendly and
> outgoing today, joking around a great deal," and stated that his
> "socialization seems to be full range" (Exhibit 16FI6).  In looking at the
> totality of the evidence of record, the undersigned finds that Dr. Neims'
> opinion is inconsistent with the evidence of record.

Tr. 19.  Plaintiff argues the ALJ failed to acknowledge that in March 2007, Mr. Bushue noted he

was experiencing fairly vivid nightmares that were bothersome and was experiencing side effects

from his Interferon treatment that were bothersome, and that in May 2007, Mr. Bushue noted as

well that he reported experiencing "some symptoms" after having stopped one of his psychiatric

medications. See Tr. 314, 317.  But none of this additional evidence actually calls into question

the fact that Mr. Bushue's late April 2007 treatment note indicated a level of social functioning

directly at odds with the limitations in that area noted by Dr. Neims.  Nor does the evidence cited

by plaintiff actually reveal any specific work-related limitations contradicting Mr. Bushue's late

April treatment note findings.  That evidence, furthermore, clearly is based on plaintiff's own

self-reports, and, as explained in greater detail below, the ALJ overall did not err in discounting

his credibility regarding his subjective complaints.

In addition, this stated reason for rejecting the opinion of Dr. Neims, along with the other

REPORT AND RECOMMENDATION - 10

two improper reasons discussed above, must be read in the context of the following findings the

ALJ made with respect to the medical evidence in the record concerning plaintiff's mental health

impairments and limitations overall:

> The record is devoid of evidence that the claimant had a 12-month period of
> disability from the alleged onset date of September 30, 2005. . . .

> With respect to the claimant's mental health condition, it appears that the
> claimant established care for mental health in April 2006.  Dr. [Eddy] Cates[,
> M.D., a treating physician,] noted that the claimant "has a long history of
> depressed moods" with "two not previously recognized suicide attempts," but
> "[h]e has never been evaluated for depression or been hospitalized."  Dr.
> Cates documented that the claimant described chronic depression symptoms, a
> really depressed mood, low self-esteem, and significant insomnia.  Absent
> from the record is any mention of hallucinations or paranoia.  Dr. Cates
> continued the claimant on Seroquel (which the claimant started in the
> inpatient drug treatment program) and started him on fluoxetine (Exhibit
> 4F/11).

> In May 2006, Dr. Cates noted that "the patient reports that the fluoxetine 20
> mg daily has significantly improved his depression.  He feels his mood is
> better.  He is less irritable" (Exhibit 4F/9).  In a June 2006 psychological
> evaluation, Dr. Neims opined that the claimant had severe mental health
> symptoms, and severe and marked limitations in cognitive and social factors
> (Exhibit 2F); however, in August 2006, the claimant presented to D. Dabrock,
> M.A. "as outgoing and friendly, states meds have helped to reduce sx
> [symptoms] somewhat" (Exhibit 16F/24).  In July 2006, when Dr.[Harpreet
> S.] Brar[, M.D., another treating physician,] inquired regarding the claimant's
> behavior health issues, "he simply indicates that he is stable" (Exhibit
> 15F/13).  In March 2007, Nurse Bushue assessed the claimant as presenting
> "today with a full range of affect.  He was very friendly and outgoing.  He
> states that the increase in Celexa and Geodon recently was very effective in
> helping him to control his symptoms of both mood and thought disorder"
> (Exhibit 16F/9).  In April 2007, Nurse Bushue noted that the claimant
> "presents very friendly and outgoing today, joking around a great deal.  He
> states that he continues to do exceedingly well" (Exhibit 16F/6).

> In a March 2008 appointment, Dr. Cates stated that the claimant "feels his
> mood is well controlled.  He has quit Behavioral Health Resources and is not
> established with a new psychiatrist.  He is requesting that this provider assume
> management of his medications" (Exhibit 23F/19).

Tr. 19-20.  As succinctly summarized by the ALJ above, the medical evidence in the record here

REPORT AND RECOMMENDATION - 11

contradicts the marked to severe functional limitations assessed by Drs. Neims and Troubridge,

and the ALJ's reliance on the former to find plaintiff did not have a 12-month period of disability

due to his mental health impairments, is in itself a clear and convincing, let alone legitimate and

specific, reason for discounting those limitations. See Batson, 359 F.3d at 1195 (ALJ need not

accept opinion of even treating physician, if that opinion is inadequately supported by record as

whole); see also Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149.

D.    Hepatitis C

In noting the record was devoid of any evidence of a 12-month period of disability since

the alleged onset date, the ALJ also stated in relevant part in regard to plaintiff's hepatitis C that:

> . . . The claimant was not diagnosed with hepatitis C until May 2006, and did
> not seek mental health treatment until April 2006.  The claimant asked to be
> tested for hepatitis C in May 2006 as he suspected that he might have
> contracted it from his girlfriend.  In the exam with Dr. . . . Brar, . . . the
> claimant denied ever having become ill as a result of hepatitis C, and it is
> noted that he never had any jaundice (Exhibit 15F/18).  A May 2006
> ultrasound demonstrated a normal appearing liver without a focal lesion
> (Exhibit 15F/16).  When the claimant's biopsy was positive for chronic
> hepatitis C, the claimant underwent pegylated interferon and ribavirin
> treatment for approximately one year.  As of August 26, 2008, the claimant
> had normal findings with no hepatitis C virus and [Dr.] Cates . . . considered
> the claimant cured (Exhibit 23F).
>
> . . .
>
> . . . in September 2006, the claimant reported to Dr. Brar with complaints of
> fevers with each injection that lasted a couple of days, "otherwise he has no
> current complaints" (Exhibit 15F/11).  In October 2006, the claimant reported
> having a lot of nausea, fatigue and body aches the previous week, and stated
> that his depression was a bit worse (Exhibit 15F/9).  In week nine of
> treatment, Victoria Moore, P A-C noted that the claimant "continues to feel
> reasonably well, although his depression increased a bit["] (Exhibit 15F /7).
> The claimant reported some increased fatigue, exertional shortness of breath,
> and fairly frequent headaches; however, Ms. Moore did not related these
> symptoms to the treatment (Exhibit 15F/5).  As Ms. Moore noted the claimant
> was doing "quite well," as of the end of December 2006, she allowed follow-
> up visits less frequently at every other month (Exhibit 15F/3).  Ms. Moore saw
> the claimant prior to his forty-eighth week of treatment.  She stated of the

claimant that "[h]e has managed to stay on full dose therapy during the entire treatment with excellent tolerance throughout."  The claimant complained of fatigue, however, upon examination, she noted that "he looks well," and stated in her impressions that "[h]e's completing one year of treatment in mid-August.  He has done very well" (Exhibit 20F).

Tr. 19-20.

Plaintiff argues the ALJ's above findings are inaccurate, asserting that at the hearing the ALJ in fact stated:

> . . . I'm sympathetic to Interferon treatment and if you and your client want, I'd approve of a closed period [of disability] during the treatment and I would put from August, I'd say August 1 '06 to August 30th of '07?

Tr. 36.  But the undersigned agrees with defendant that this statement must be read in context with what the ALJ subsequently stated at the hearing:

> . . . Now, . . . I'm kind of going through this, and I indicated at first that I, Interferon can cause some effects, but I'm going through and I don't see much in the record as to any serious side effects that he had.  Can, can you call something out which is, they directly relate to, let's say either be very fatigued, nausea, sick because of the Ribavirin, or the --
> . . .
> . . . I just want to see, in the record here, because I noticed at one point, I mean this was towards the end in April, he went in and said you're really doing well, . . .

Tr. 48.  Accordingly, while it may have been that the ALJ originally felt he might grant plaintiff a closed period of disability, upon further review of the evidence in the record – or rather a lack thereof in regard to disabling limitations – the ALJ indicated fairly clearly that he did not see any support for granting such a closed period after all.  Thus, there was no discrepancy that the ALJ was required to explain.

Plaintiff further argues the evidence concerning his hepatitis C summarized by the ALJ above does not prove that he was not experiencing any symptoms prior to the dates he was first diagnosed with that condition.  But even if this is so, plaintiff has pointed to no evidence in the

REPORT AND RECOMMENDATION - 13

record that he experienced any significant, let alone disabling, limitations due to his hepatitis C prior thereto.  Similarly, the fact that plaintiff may have had hepatitis C for a 28 month period rather than just for 12 months is irrelevant here, given that he again has failed to show the record establishes the presence of significant, disabling work-related limitations during even the greater of the two periods of time.  For the same reason, the mere fact that treatment notes in the record may indicate that plaintiff experienced some level of fatigue and myalgias, as well as some other symptoms such as increased depression and decreased concentration is not sufficient to overturn the ALJ's findings here, since again nothing in the treatment notes plaintiff cites reveal actual, specific work-related limitations causing restrictions greater than those adopted by the ALJ and discussed below. See Tr. 274, 276, 280.

E.   Twelve-Month Period of Illness

The ALJ also stated in his decision that "[b]ased on the totality of the evidence of record, . . . any illness caused by his affective disorder or hepatitis C was not 12 months in duration." Tr. 20.  Plaintiff argues this statement is not supported by substantial evidence.  It certainly appears from the record that plaintiff has had those conditions for at least 12 months, but any error by the ALJ here was harmless. See Stout, 454 F.3d at 1055 (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion).  This is because, as discussed above, the ALJ also specifically found that neither plaintiff's affective disorder nor his hepatitis C had resulted in "a 12-month period of disability" (Tr. 19 (emphasis added)), which makes the ALJ's later statement regarding any illness not having lasted 12 months in duration irrelevant to the ultimate disability determination in this case.

III.   The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the ALJ's control. See Sample v. Schweiker,

REPORT AND RECOMMENDATION - 14

694 F.2d 639, 642 (9th Cir. 1982).  The Court thus should not "second-guess" this credibility

determination. Allen, 749 F.2d at 580.  In addition, the Court may not reverse a credibility

determination where that determination is based on contradictory or ambiguous evidence. See id.

at 579.  That some of the reasons for discrediting a claimant's testimony should properly be

discounted does not render the ALJ's determination invalid, as long as that determination is

supported by substantial evidence. Tonapetyan , 242 F.3d at 1148.

      To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent

reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what

testimony is not credible and what evidence undermines the claimant's complaints." Id.; see also

Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the

claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear

and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of

malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

      In determining a claimant's credibility, the ALJ may consider "ordinary techniques of

credibility evaluation," such as reputation for lying, prior inconsistent statements concerning

symptoms, and other testimony that "appears less than candid." Smolen, 80 F.3d at 1284.  The

ALJ also may consider a claimant's work record and observations of physicians and other third

parties regarding the nature, onset, duration, and frequency of symptoms. See id.

      The ALJ discounted plaintiff's credibility in part for the following reason:

The undersigned finds the claimant only partially credible, finding that there
are many discrepancies between the claimant's statements in the record.  The
State agency's psychological consultant noted that the claimant's reports
regarding his prior dependence on both drugs and alcohol varied.  For
example, in May 2006, the claimant told Dr. Khanna that he was "never
really an alcoholic" (Exhibit 15F/18), but informed [Mr.] Bushue . . . in
September 2006 that "he considered himself a full-blown alcoholic at the age
of 13" (Exhibit 6F).  Similarly, he informed Dr. Khanna that his alcohol use

REPORT AND RECOMMENDATION - 15

had become "quite severe," but that he stopped drinking over a year ago (Exhibit 4F/4). The claimant had also reported that he terminated all drug use in January 2006 while in chemical dependency treatment at St. Peter Hospital, yet on June 12, 2006 he said that he "has been clean and sober for about five months," but had terminated his marijuana use only "four to five months ago" (Exhibit 4F/4). In June 2006, the claimant claimed to have "8-9 months sobriety" (Exhibit 2F/7), but elsewhere he endorsed a history of almost daily continuous methamphetamine use. To [Dr.] Neims . . . the claimant admitted a history of "alcohol dependence" (Exhibit 10F/13). The State agency's psychological consultant further noted that the claimant's psychiatric diagnoses vary in accordance with the expected sequelae of drug and alcohol toxicity and/or having his report of hearing voices be interpreted as indicative of an endogenous psychosis, with other indications of a diagnosis of mild depression (Exhibit 10F). Furthermore, the undersigned notes that the claimant alleged in his application that his mental health symptoms began when he became sober, which by most common accounts was January 2006. However, the claimant has alleged in his application an onset date of September 30, 2005.

Tr. 18. While plaintiff asserts the examples cited by the ALJ above are selective, insignificant differences, and thus do not provide a sufficient basis to undermine his credibility, the evidence in the record clearly shows otherwise. See Tr. 212, 215-16, 218-20, 236, 238, 241, 287, 291-92, 313, 325, 342, 346, 368, 390-91.

The ALJ also gave the following reason for discounting plaintiff's credibility:

The claimant's disability application is further undermined by evidence of secondary gain motivations. In September 2006, Nurse Bushue stated regarding the claimant's employability: "[ a]t this time, it does not appear that the client is interested in any type of employment. He does receive medical coupons, plus $339 per month" (Exhibit 6F/6). In a December 2006 session with Nurse Bushue, the claimant "did state that he was concerned about not being accepted for SSI. . . . He is fearful that if he is denied again, he will lose his medical coupons" (Exhibit 16F/15).

Tr. 18. A claimant's motivation and the issue of secondary gain may be considered in rejecting his or her symptom testimony. See Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Plaintiff again argues the ALJ is only selectively citing the record here. But, once more, the undersigned agrees with the

REPORT AND RECOMMENDATION - 16

ALJ that there is evidence in the record of motivation and secondary gain issues.  Indeed, the fact that plaintiff's own treatment provider observed that he did not appear interested "in any type of employment," by itself is strongly indicative of such issues. Tr. 18; see also Tr. 242.

Nor has plaintiff shown the GAF score of 48 assessed by Mr. Bushue or his description of plaintiff's symptoms or of the side effects to which he cites, explain the evidence of secondary gain shown here.  Plaintiff asserts the fact that he was experiencing all of the above and was not interested in working is not a clear and convincing reason for discounting his credibility.  There is no indication from Mr. Bushue's September 2006 observation, however, that plaintiff's lack of interest in working were due to his alleged impairment-related symptoms or to medication side effects.  As such, it was not unreasonable for the ALJ to assume plaintiff's lack of interest more represented a desire not to work than a reflection of his health conditions.  While the undersigned does agree that the fear of losing medical coverage alone is not sufficient to necessarily establish motivation issues, as just discussed, Mr. Bushue's prior observation does.

As discussed above, the ALJ properly found the weight of the medical evidence in the record showed plaintiff did not suffer from disabling limitations stemming from his hepatitis C or affective disorder.  The ALJ also noted this evidence in the context of discounting plaintiff's credibility. See Tr. 18-21.  The undersigned finds the ALJ did not err in relying in part on that evidence to do so here. See Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998) (determination that claimant's complaints are inconsistent with objective medical evidence can satisfy the clear and convincing requirement).  Indeed, also as noted by the ALJ above, Ms. Moore stated in July 2007, that plaintiff had "done very well" following treatment for hepatitis C, and according to Dr. Cates, plaintiff reported in March 2008, that he felt his mood was "well controlled." See Tr. 20, 361, 393; see also Morgan, 169 F.3d at 599 (credibility of claimant may

REPORT AND RECOMMENDATION - 17

be discounted on basis of medical improvement); Tidwell, 161 F.3d at 601.

The ALJ further discounted plaintiff's credibility in part for the following reason:

The claimant's multiple missed treatment appointments further indicate that the claimant's symptoms are not sufficiently severe to require sustained treatment. The claimant did not show for scheduled appointments on June 19, 2007; March 6, 2007; January 26, 2007; January 11, 2007; or November 28, 2006 (Exhibit 16F), nor for appointments on April 4, 2008; October 26, 2007; or February 5, 2008 (Exhibit 21F). The claimant requested that his chart be closed in April 2008 (Exhibit 21F/8).

Tr. 20. Plaintiff argues this is not a convincing reason to completely discount his credibility, but the Ninth Circuit has noted that a claimant's failure to assert a good reason for not following a prescribed course of treatment "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). In addition, as discussed herein, the ALJ has stated several other valid reasons for discounting plaintiff's credibility. Plaintiff also challenges this stated reason for discounting his credibility by noting that he was not getting along with Mr. Bushue. This was not a reason plaintiff gave, however, for missing the above appointments. See Tr. 312, 315, 321-22, 326, 363, 365, 367. Indeed, one of the reasons he gave for missing one of his appointments was that he "totally spaced it out," because he was "out looking for work." Tr. 363. Only two of the missed appointments, furthermore, were ones scheduled with Mr. Bushue. See Tr. 322, 367. There as well, or elsewhere in the record, plaintiff did not state that problems getting along with Mr. Bushue as being a reason for his missed appointments.

The ALJ also gave the following reasons for discounting plaintiff's credibility:

While the claimant has alleged that he could not work during the period at issue, according to May 2006 treatment notes, the claimant had "been working in landscaping and has been very physically active during the day" (Exhibit 4FI9). In a psychological evaluation of July 2007, [Dr.] Troubridge . . . stated of the claimant, "lately he has worked a few jobs at Labor Ready, but he fell chasing a dog" and injured his right leg (Exhibit 22F). In April 2008, a note from Behavior Health Resources shows that the claimant was "out looking for work in Tacoma" (Exhibit 21F/l). The claimant testified that he got on a

REPORT AND RECOMMENDATION - 18

1
2

union "alternate" list in January 2008 which indicates his ability to work, and then returned to full-time work in September 2008.  He further testified that he was working full-time as of the hearing.

3
4
5
6
7
8
9
10

Tr. 21.  Citing to Lingenfelter v. Astrue, 504 F.3d 1038 (9th Cir. 2007), plaintiff argues the fact that he attempted to work and ultimately returned to work is not a convincing reason to discount his credibility regarding those periods when he was unable to work.  The point here, however, is that the above work activity shows plaintiff was able to work during the period in which he now claims he was unable to work, which clearly undermines his credibility as a whole.  In addition, reliance on the Ninth Circuit's decision in Lingenfelter is misplaced, as the facts in that case are entirely distinguishable from the matter at hand.[3]

11
12
13
14
15
16
17
18
19
20

Lastly, the ALJ discounted plaintiff's credibility on the following basis:

. . . [T]he claimant's activities of daily living are not limited to the extent one would expect given his complaints of disabling symptoms and limitations.  In his September 2006 function report, the claimant stated that he cooks frozen food, does laundry, and cleans.  He reported that he does not drive, but only because he does not have a driver's license.  He stated that he shops for food and clothes.  He further reported that he attends Alcoholics Anonymous meetings and counseling appointments (Exhibit 5E).  Lynda L. Scott, the claimant's mother, also completed a function report.  She stated that she and the claimant watch TV, cook, talk, and play games together. She reported that the claimant uses the computer (Exhibit 6E).  Nurse Bushue noted that "[t]he client continues to attempt to stay busy at home.  He had been using his computer, but that is apparently not working now."  In November 2006, the claimant reported to Nurse Bushue that "he is trying to kill some time by reading or visiting with friends" (Exhibit 16F/19).  In April 2007, the claimant

21
22
23
24
25
26

[3] In Lingenfelter, the claimant was fired from a job he had performed for a period of nine weeks after his date last insured, "because he was too slow to do the work adequately." Id. at 1033.  The claimant also testified that "when he returned home from work each day his 'feet were so swollen,' and that he 'just couldn't do it anymore' because of the pain." Id. (quoting plaintiff).  The Ninth Circuit stated that the mere "fact that a claimant tried to work for a short period of time and, because of his impairments, failed," does not mean "that he did not then experience pain and limitations severe enough to preclude him from maintaining substantial gainful employment." Id. at 1038 (emphasis in original).  The Court of Appeals found this reason to be "especially unconvincing" where the claimant attempted to work "only because of extreme necessity," because "[u]nder these circumstances," it was "at least as likely that the claimant tried to work in spite of his symptoms, not because they were less severe than alleged." Id. at 1038-39 (quoting ALJ).  The Ninth Circuit further expressly noted that the claimant's "failed work attempt did not even take place during the relevant time period" – i.e., the period between the alleged onset date of disability and date last insured. Id. at 1039 (noting claimant had burden to prove he was disabled for at least twelve month period during that time).  Clearly, the facts of Lingenfelter are inapposite to those here.

REPORT AND RECOMMENDATION - 19

reported that he started playing the flute, and that he is attempting to teach himself how to play it (Exhibit 16F/6).

Tr. 20-21.  To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities.  Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues, and the undersigned agrees, that the activities set forth by the ALJ above do not establish that plaintiff is able to spend a substantial part of his day performing household shores or other activities that are transferable to a work setting, nor does the substantial evidence in the record support a finding that they do so. See Tr. 45-46, 119-25. 138-44, 146-54, 176, 180, 316, 318, 329.  Nevertheless, the fact that one of the reasons for the ALJ gave for discounting plaintiff's credibility was improper, does not render the ALJ's credibility determination invalid overall, as long as that determination is supported by substantial evidence in the record, as it is in this case for the reasons discussed above. Tonapetyan, 242 F.3d at 1148.

IV.    The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Id. at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample,

REPORT AND RECOMMENDATION - 20

1   694 F.2d at 642.

2        The record contains a report completed by plaintiff's mother, in which she provided her

3   observations of plaintiff's symptoms and functional limitations. See Tr. 146-54.  As noted above,

4   in his assessment of plaintiff's credibility, the ALJ stated in relevant part as follows:

5        . . . Lynda L. Scott, the claimant's mother, also completed a function report.
6        She stated that she and the claimant watch TV, cook, talk, and play games
         together.  She reported that the claimant uses the computer (Exhibit 6E). . . .
7

8   Tr. 20.  Plaintiff argues the ALJ only briefly discusses plaintiff's mother's observations, and fails

9   to mention any of her other stated observations that provide support for his own allegations.  The

10  undersigned agrees the ALJ erred here.  For example, plaintiff's mother stated that he sometimes

11  had to sleep all the time, needed occasional reminders in regard to his personal care tasks, did not

12  spend much time with others, needed encouragement to go anywhere or to do things, sometimes

13  could not pay attention, did not finish what he started, had trouble following written instructions,

14  and did not get along with authority figures well. See Tr. 147, 150-51.  Defendant argues these

15  observations are consistent with the ALJ's determination to limit plaintiff to performing simple

16  and routine tasks. with occasional contact with the public. See Tr. 16.  But clearly an inability to

17  finish tasks, pay attention at times, fully follow written instructions, or get along with authority

18  figures is, for example, not fully encompassed by such limitations.

19

20  V.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

21        If a disability determination "cannot be made on the basis of medical factors alone at step

22  three of the evaluation process," the ALJ must identify the claimant's "functional limitations and

23  restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p,

24  1996 WL 374184 *2.  A claimant's residual functional capacity ("RFC") assessment is used at

25  step four to determine whether he or she can do his or her past relevant work, and at step five to

26

REPORT AND RECOMMENDATION - 21

determine whether he or she can do other work.  See id.  It thus is what the claimant "can still do

despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is

able to perform based on all of the relevant evidence in the record.  See id.  However, an inability

to work must result from the claimant's "physical or mental impairment(s)." Id.  Thus, the ALJ

must consider only those limitations and restrictions "attributable to medically determinable

impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the

claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be

accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

**. . . the claimant has the residual functional capacity to perform the full
range of light work . . . The claimant can occasionally lift and carry 20
pounds, frequently lift and carry 10 pounds, stand and/or walk about 6
hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and
perform pushing/pulling of arm or leg controls.  The claimant can
perform only simple and routine tasks.  The claimant can have only
occasional contact with the public.**

Tr. 16 (emphasis in original).  Plaintiff argues this RFC assessment is improper because the ALJ

failed to include all of the limitations described by Drs. Cates, Neims, Troubridge, and Brar, as

well as those from Ms. Bushue and Ms. Moore.  However, plaintiff fails to explain exactly what

specific work-related limitations Dr. Cates found him to have, nor does the record establish that

he in fact assessed any. See Tr. 210, 213-20, 377, 390-93, 395.  The same is true in regard to Dr.

Brar and Ms. Moore. See Tr. 274-84, 286-93, 361-62.  Further, as discussed above, the ALJ did

not err in rejecting the findings and opinions of Drs. Neims and Troubridge, or in discounting the

credibility of plaintiff's testimony, which plaintiff asserts the ALJ also should have considered in

determining what limitations to include in his RFC assessment.

REPORT AND RECOMMENDATION - 22

On the other hand, as discussed above, the ALJ erred in failing to properly consider the GAF scores in the record, including that assessed by Mr. Bushue.  Also as discussed above, the ALJ failed to conduct a proper step two determination with respect to plaintiff's other diagnosed mental impairments, and to properly evaluate the lay witness evidence in the record.  In addition, the undersigned agrees with plaintiff that the ALJ erred in failing to adopt or explain why he was rejecting, all of the mental functional limitations assessed by the two state agency psychologists, Carla van Dam, Ph.D., and Bruce Eather, Ph.D., even though the ALJ found their assessments to be consistent with his own. See Tr. 21, 252-54, 272.  For example, while as noted above, the ALJ limited plaintiff to simple and routine tasks with occasional contact with the general public, Drs. van Dam and Eather also found plaintiff to be moderately impaired in his ability to:

- maintain attention and concentration for extended periods;
- perform activities within a schedule;
- maintain regular attendance;
- be punctual within customary tolerances;
- sustain an ordinary routine without special supervision;
- complete a normal workday and workweek;
- perform at a consistent pace;
- respond appropriately to changes in the work setting; and
- set realistic goals or make plans independently of others.

Tr. 252-53.  Clearly, the above assessed limitations are not adequately covered by the two mental functional limitations adopted by the ALJ in his decision.

VI.     The ALJ's Findings at Step Five

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines.

REPORT AND RECOMMENDATION - 23

Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Id. (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the hearing, the ALJ posed a hypothetical question to the vocational expert containing substantially the same limitations as were included in the ALJ's assessment of plaintiff's residual functional capacity. See Tr. 52. In response to that hypothetical question, the vocational expert testified that an individual with those limitations, and who had the same age, education and work experience as plaintiff, would be able to perform other jobs. See Tr. 52-53. Based on the testimony of the vocational expert, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. See Tr. 22.

Plaintiff argues the ALJ's hypothetical question did not include all of his limitations. In light of the ALJ's errors noted above in conducting his step two determination, and in evaluating the assessed GAF scores and the lay witness evidence in the record – and thus also in assessing plaintiff's RFC – it cannot be said with certainty that the ALJ's hypothetical question accurately reflected all of plaintiff's limitations. However, the undersigned rejects the additional contention that the ALJ was required to adopt and include in his hypothetical question a limitation that two or more days of work per month on a routine basis would be missed, that breaks over and above

REPORT AND RECOMMENDATION - 24

those normally allowed would be necessary or that the ability to lie down for several hours during the day due to fatigue would be required, as it is not clear these limitations are supported by the substantial evidence in the record.

VII.    This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain in regard to the severity of plaintiff's mental health impairments, the GAF scores contained in the record, the lay witness evidence from plaintiff's mother, plaintiff's residual functional capacity, and plaintiff's ability to perform other work existing in significant numbers in the national economy, this matter should be remanded to defendant for the purpose of

REPORT AND RECOMMENDATION - 25

1   conducting further administrative proceedings.

2                                 CONCLUSION

3          Based on the foregoing discussion, the Court should find the ALJ improperly concluded

4   plaintiff was not disabled.  Accordingly, the Court should reverse defendant's decision and

5   remand this matter to defendant for further administrative proceedings in accordance with the

6   findings contained herein.

7          Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.")

8

9   72(b), the parties shall have **fourteen (14) days** from service of this Report and

10  Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file

11  objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn,

12  474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk

13  is directed set this matter for consideration on **March 25, 2011**, as noted in the caption.

14         DATED this 14th day of March, 2011.

15

16

17

18                                           Karen L. Strombom
19                                           United States Magistrate Judge
20

21

22

23

24

25

26

REPORT AND RECOMMENDATION - 26